The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning. We have a busy morning this morning. We have four cases set for argument and we have one case that has been submitted on the briefs. We're ready to proceed now with the first case and this is Tech Pharmacy Services, LLC v. Alixa Rx, LLC, number 19-1488. Mr. Melsheimer, are you ready to proceed? I am, Your Honor. And I understand that you reserve five minutes for rebuttal, correct? Yes, Your Honor. Okay, you may begin. May it please the court. I'm Tom Melsheimer. I'm here on behalf of Philmore Capital Partners and GoldenGate National Senior Care. I will refer to these parties collectively as GoldenGate. I hope the panel is safe and well. Our main issue on appeal relates to Tech Pharmacy, sometimes called Advanced Pharmacy's breach of contract claim against GoldenGate. There are two parts to the argument we've made. First, the district court's judgment as to the adverse and rendered in favor of Golden Loving because Tech Pharmacy failed to offer any evidence demonstrating that GoldenGate's alleged breach of the 2009 confidentiality agreement proximately caused Tech Pharmacy's lost profits. And then second and relatedly, we are entitled to judgment in our favor because Tech Pharmacy completely failed to distinguish between the alleged damages attributable to the breach of contract claim, the fraud claim, the patent infringement claim, and the trade secret misappropriation claim, the last three of those claims all having been rejected by the jury. I'd like to start with proximate cause and to do that we have to first look at the record to determine what confidential information could have conceivably been the proximate cause of any damage. We raised this question in our brief and Tech Pharmacy identified three alleged confidential information. One was the general site visit to machine location with no specific confidential information identified. Another was a conversation between us and the former CEO of Tech Pharmacy, again without any cost of goods sold, and that's at appendix 13032. Your Honors, we must then search for what evidence exists that shows a causal connection between the alleged breach and Tech Pharmacy's lost profits. They pled a lost profits case and indeed their theory is that but for the use of... Yes, this is Judge Reyna. I'm very interested in the damages issues here. Why is it that the evidence that's been submitted as to the value of the tech company being above $50 million? Why does that not serve as evidence? That goes to lost profits. Your Honor, thank you. Your Honor, because the valuation that the district court pointed to and indeed that Tech Pharmacy points to on appeal has nothing to do at all logically or reasonably with their claim of lost profits. Remember that $15 million is a reference to an 85% interest in all of Tech Pharmacy, which would have included all their trade secrets, their patents, their property, anything, an 85% interest in that. It is not the theory that they went to the jury on. They did not go to the jury on an issue of the value of the company. So just because that number's out there and you know the district court in an attempt to explain the $15 million damage number said, well, the jury could have looked at this and that may be that they could have looked at it, but the problem, Your Honor, is it has no relationship whatsoever causally or otherwise to the claim of lost profits and but for damages. Remember their claim is... This is Judge Reyna again. Why isn't it then just that valuation, where's the valuation evidence? When you sought to offer a controlling interest in the company, why is it the $15 million dollars indicative of the value of the business venture? That's what you offered. Your Honor, it is some evidence of what we valued an 85% interest in the company in. That's true. Now it was not it was not accepted and we were under no obligation to make that, but Your Honor, that's not their claim for damages. Their claim for damages is that but for our use of confidential information, this is what their expert says starting at Appendix 7258, they say that but for our use of some unspecified confidential information, we wouldn't have been able to create a competitor to them and because we created a competitor with that information, they allegedly lost profits. Our valuation of an 85% interest in their company is not connected to that in any way and I would submit that that is simply a bridge too far for this court or for the jury to reach. It is a number that is in the record and if we were arguing, if this case was about, well, what was the value of their business and they had an expert that said, well, the value was $100 million and we had an expert that said, no, the value is $1 million, then you'd have a classic case where the jury would be entitled to look at the evidence and come up with their own number. That is not this case, Your Honor. This is a case where they specifically were limited under Delaware law to lost profits of their business as a result of our breaching the confidentiality agreement and they said in the but-for world, we wouldn't have been able to have a competing business and they offered no evidence from which a reasonable jury could have drawn any number. Their expert didn't do it and there's no evidence in the record from which the jury could have done it. I don't believe that the $15 million, even though that was a stated number that we offered that was in some sense our version of evaluation, you can't simply say, well, that's lost profits in a but-for world. Their expert didn't try to do that and no other expert in the trial attempted to do that. What their expert did do, Your Honor, is he attempted to identify, to show a causal connection between the breach and Tech Pharmacy's lost profits. Now, the truth is, they threw a lot of stuff up to distinguish between the various causes of action, but he identified, he made five different statements starting at 7258 of the appendix and he said these were the, this was the evidence of causation. One, that there were certain benefits associated with remote packaging and dispensing of pharmaceuticals. No one can test that and it's not confidential. He cites the fact that Tech Pharmacy was Golden Living or Golden Gate's most highly recommended provider for services. Again, no one can test that, that's not confidential. Third, he stated that what Golden Living had said or Golden Gate had said that it only wanted one provider for these services. And again, no one can test that, has nothing to do with confidential information. He finally, fourthly, he said that the Alexa machines that were developed later and the Tech Pharmacy machine was functional equivalent. This generalization still fails to show how any specific confidential information was used to form a competitor. And finally, he says that Alexa, the company that Golden Gate formed, stepped in and took facilities away from Tech Pharmacy. Now, it's true that Alexa became a competitor and may well have taken business from Tech Pharmacy. However, the link between a specific piece of confidential information that that was used to become a competitor or cause lost profits. And in fact, your honor, this agreement is in this 2009 confidentiality agreement, is not an agreement not to compete. It's at the appendix 105.7.8. It's not an agreement not to compete. It's not an agreement that offers a right of first refusal. In fact, it presumes in it that there will be no transaction between the parties at all, and the parties can go on their way. The only restriction is, is we can't use confidential information as specifically defined in that agreement. Now... Okay, counsel, can you go on to the issue of non-infringement? Yes, your honor. Yes, your honor. With respect to that issue, that was a hotly contested issue in front of the jury. The issue in that was management and control, whether or not the central location or the central pharmacy controlled the dispensing of the medications in the nursing homes. And it was a hotly contested issue. There was... They are... If I might just finish that answer, your honor, and I know I'm going to my rebuttal time. That is an issue where we argued that the nurses on the ground in the nursing home had control, that they had some semblance of control, that the medication could not be dispensed without the nurse taking action. We argued that meant that the central pharmacy was not controlling. The plaintiffs argued something different. The jury heard both sides of that and concluded that there was not the managing control as required by the patent and by the course markment construction. The plaintiff here is trying to rewrite that construction to make it control to some extent, I submit. And that's not the construction, that's not what the jury heard. The jury heard evidence on both sides, and they did find, as they did, that there was no infringement. I'll reserve the rest of my time, your honor. Good morning, your honors, and may it please the court, Jessica Ellsworth for Tech Pharmacy. The defendant's counsel began this morning by telling you that their contract appeal rests on two arguments, one about proximate causation and one about damages. I want to be clear on what their appeal doesn't involve, and that's an appeal of the district court's finding that the jury was within its discretion to find that there was a breach of the agreement. At footnote one of the defendant's reply brief, they suggest that they are also making an argument about whether there was a breach of the contract. That that argument was not and is waived. So that leaves them with with two issues, and two issues only, proximate cause and damages. And those two issues really go together. This was a three-week trial to a jury who heard extensive witness testimony and saw extensive documentary evidence showing that Tech Pharmacy shared extensive confidential information with the defendants under a confidentiality agreement that limited the defendant's use of that information. And then the defendant turned around and created a very similar competing business. This is Judge Reyna. Let's assume for a minute that there was a breach, and that's not a dispute. Your opponent argues that there's no damages, there's no connection between the jury award of damages and back to the breach. What's your reply to that? Certainly, Your Honor. For one thing, the jury was free to infer from the extensive testimony about the confidential information that was provided and the development of the very similar competing business that the confidential information played a role in it. After all, it violated the confidentiality agreement if the defendants used the confidential information even to just accelerate the research and development of their own device and systems. Here, under Delaware law, which applies and just requires an estimate of damages, you have an expert who testified extensively for 25 pages how he calculated the lost profits that Tech Pharmacy would have made in the absence of wrongful conduct by the defendants. And the jury was instructed to use lost profits for the contract claim. If you look at Dr. Ugon's testimony about how he reached his calculation, and it runs from roughly page 7250 to 7274 of the appendix, he carefully walks through the evidence showing that there was a demand for Tech Pharmacy's machines from Golden Living without ELIXIR, would have looked to Tech Pharmacy to fill its needs. He walks through the revenue, the cost, and the profits on a per machine basis, Tech Pharmacy's manufacturing and marketing capabilities, the cost of making machines, and of course his number that he presented to the jury was $65 million. But then the defendants cross-examined him, and they argued that Tech Pharmacy's system was only approved in three states, and Golden Living operated in 20. They talked about there being no basis in their cross-examination for 30 placements at non-Golden Living facilities, and then they presented their own expert on damages who opined that the damages number should be adjusted down to approximately a million. So you have what happens in a fairly routine setting at a trial, where parties give juries sets of offer and their basis for those numbers, and the juries get to weigh the evidence, weigh the testimony, and make classic credibility and judgment calls that courts give deference to, like the district court did below, after having sat through the trial and denying the J. Moll motion. For the same reasons that the district court denied the motion, this court should affirm that I don't want to jump in on you, but I wanted to see if I could maybe ask you a question on a different area, if I could. What do you say about the 101 argument that is raised by your colleague on the other side, that really what you have here is a situation where the claims are related to nothing but the traditional process of pharmaceutical approval and distribution and so forth, so that they're abstract. What is your response to that, if you could? Certainly, Your Honor. The defendant's argument on 101 essentially boils down to the fact that there is technology involved in this, and that this is a claim, the claims are here, are for systems and methods of remotely controlling and operating pharmaceutical dispensing. But that's where the defendant's argument stops, and that's not where the claims stop. Whether this court comes at it through Alice Step 1 or Alice Step 2, the question that the court is ultimately trying to answer, what these two Alice Steps get at, is whether there is some improper attempt to monopolize, in this case, an abstract idea. And if I could, Your Honor, I'd like to just give you five examples from the claims that show that the claimed methods and systems are not a monopoly on the idea of remote dispensing. And I'm going to use claim 7 of the 019 patent, because that's what the district court looked at below, and the parties have used at various times. So first, that claim requires that the machine package and dispense the drugs into disposable packages. So if a machine uses pre-packaged pharmaceuticals, or it uses reusable packaging, it's outside the claim, even though the system would still engage in remote dispensing. Is it your argument that the dispensing cart, that's the machine you're talking about, correct? Yes, Your Honor, that is, that is, there is a machine used in the claims that is a dispensing cart, yes. Okay, and are you saying that this is not a general-purpose computer of any kind? It is a, it does involve computer, it does involve a computer, but it's a particular kind of machine that can hold capsules with hundreds of different drugs that are required to be dispensed by a pharmacist. And it can... Hi, this is Judge Stoll. So following up on Judge Stoll, when you said that this is not a computer or system machine made to dispense medication, the question was whether you thought it was a general-purpose computer, like a PC. And so what is your answer to that? No, it's not. It has some similarities in that it has hardware components, some of which are computer hardware components, but it's in no way a generic computer. Ms. Ellsworth, how did the... I have one question, Judge Stoll here. How do the medications physically get into the cart? Somebody has to put them in there, correct? That's right, and one of the things that is described in the patent is the way that the pharmacist at the central pharmacy is in charge of refilling and maintaining the inventory within the cart. Okay. And that brings up, again, another thing that I think shows that this is not a monopoly on remote dispensing. The pharmacy in this hub-and- spoke system that is claimed in these patents requires that all the dispensing units be remote from a central pharmacy and server. So if someone set up a system where there was, in fact, a machine like this located in the same site as the pharmacy, you would be outside the bounds of the specific invention that is detailed in these claims. I'd like for you to clarify... I'd like for you to clarify something for me. Now, this same system was used in hospitals, correct? Your Honor, no. This system was not used in hospitals. There were... Electronic dispensing carts were not used in hospitals prior to this invention? Electronic dispensing carts were. The patent describes this in column electronic dispensing carts being stored on each floor of the hospital to get instructions from the hospital's pharmacy computer. Right. So what your invention does here, it takes this dispensing from a remote location and it's applicable to nursing homes. That's correct, Your Honor. It's the same machine in some senses, but as the patent describes, it has been significantly adapted to be able to be remotely controllable. The point I'm trying to get to is, isn't your strong point here, or isn't this case about the software and whether the inventive step or concept is in the software? That's step two. Your Honor, I think that the software plays an extremely important role here because this court has routinely held that where software claims are directed to improvements in the functionality of a computer or a network platform, that that's enough under Alice to be a patentable invention. And there's really no question... Here you're saying there's no computer. In answer to Judge Scholl's question, you said that there was no computer. So what I intended to say was that there was no generic computer. This is not generic computing technology. There certainly are computers involved. There is a computer at a central pharmacy that is the one that manages and controls the remote dispensing units, and then the remote dispensing units that are connected via software. And it's really that software technology that enabled a pharmacist sitting in one location to enter some instructions that result in medication coming out in individually packaged envelopes or identified for specific patients in many other locations. That whole system, so a computer on one end, a dispensing cart that has a computer on the other end, and software that can bridge the two, is the invention. And then it is limited to particular types of machines operating at a particular distance from the pharmacy. The claims require multiple dispensing units be used. So if someone set up a system that just was remote control of a single dispensing unit, that's outside the claims. The claims also require dispensing into a separate and removable container. So if there's no separate and removable container used, you're outside the claims, even though you might have a system that includes remote dispensing. And then the last element of Claim 7 of the 019 patent requires a particular way of getting the prescriptions from the long-term care facility to the pharmacy, and that's through use of a document scanner. So in systems that are set up other ways, where scripts are phoned in or hand-delivered or doctors use e-prescribing, the system again is not covered by the claims. So here we really do have inventive software that enabled these dispensing units to be used in ways that they had not been used before. It is a specific improvement to computer capability, and it is claimed in a specific setup, so that it does not claim the abstract idea of remote dispensing. If I could turn just briefly to the cross-appeal. Yes, go ahead and address the cross-appeal. A reasonable jury could not have concluded that defendant system doesn't practice the control element in all six claims. And just to very quickly give the court a comparison, an analogy that I think shows why. If you imagine filling a prescription through a mail-order pharmacy, the pharmacist has to receive the prescription, fill a vial, put the right number of pills in, put them in a bag, staple it shut, put your name on it, and send the package to you. The fact that you have to open your mailbox and then open the package doesn't change that it is in fact the pharmacist who controlled the dispensing of the medication. And I think that shows why the jury here, no reasonable jury could have concluded that the nurse pushing a dispense button changed the I'd like to reserve the remainder of my time for rebuttal on the cross-appeal. Okay, thank you. May it please the court? Yes, sir. Go ahead. Your Honors, I would like to say quite plainly that the point that was made, which I tried to preview, is this notion on the breach of contract. That, well, there's all this evidence and there's that's just not the right way to look at this under these facts. Their expert never calculated lost profits related to the breach of contract. We did not offer a competing theory on the breach of contract. So this is not a case where there's all this evidence out there and competing theories. The problem with this is that, and this is true if you if you look at their own briefing, their know that the argument they're making is kind of causation in the air. They're making this suggestion that, well, somewhere there must have been some causation because there was information out there and that somehow the jury should have been able to find causation. That's not the way this court's precedence worked. That's not the way Delaware law works. They decided to put four or five different theories in front of the jury. They've had very good focus on their secret misappropriation. They said their expert never once said breach of contract and damages in the same sentence. So the jury was left to speculate on what information would be, assuming that we used it, how that approximately caused damage. And again, with respect to the valuation of the company, that could have been a theory of damage in some respect, but it's not lost profits and there's no indication that that number was in any way linked to some specific amount of or some specific identifiable confidential information. Again, that's not creating an overly undue burden on them. That's not trying to go back and second guess the jury. That's simply looking at what the rules say. They have to connect the dots. Their own experts said that they had to link a link. Why is it that under Delaware law, the jury doesn't have the ability, the right to infer causation from the circumstances? Here you presented a number of circumstances before the jury and the jury apparently picked one. Why is that not correct? Your Honor, it is certainly correct that the jury is entitled to infer causation from circumstances, but that inference has to be reasonable and it has to be based on the evidence. They can't simply look for causation in the air or pick up causation like lint in your pocket. They've got to have some link between what was used and taken by us allegedly. And remember, their theory was but for causation. It was but for this breach, we would never have set up this competing business. They could have offered other theories of damages even with respect to the breach of contract. They chose not to. Their expert assumed a world in which every liability theory was present. When multiple assumptions underlying that but for theory fell apart, no patent infringement, no trade secret misappropriation, no fraud, you were then left to look in the record for whatever information was used in the breach of same according to him but for world. And that simply is absent from the record. Now with respect to the 101 argument, Your Honor, we believe that this case is plainly covered by charge point. The court's questions have drawn out the idea that the machine here, the ADU, the automated dispensing unit, was acknowledged to be well known in the prior art. All they've got is a network system. Just like the network system in the charge point case. And if I might finish, Your Honor, or I can stop right there. You can give us a short conclusion. Your Honors, thank you. With respect to the charge point matter, we believe that is the controlling case here on 101. The primary issue for us is causation. You can't have causation in the air. They have to make the link. Their expert didn't do it. The tiles case is helpful in this regard and we suggest that the judgment on the breach of contract be reversed and rendered in our favor. Thank you very much. Thank you. And we'll hear from Counselor Ellsworth now. Thank you, Your Honor. Just on the cross appeal, because I think I'm limited to that in my cross rebuttal. The jury instructions said to use the common meaning for any words the court did not define. And the common meaning of control is something that determines the behavior of. Here, the jury heard undisputed evidence, and you can see it recited in our cross appeal reply at page 3, that ELLICS' central pharmacy computer instructs the dispensing units in their system as to what medication to package, in what dose, at what time, and for what patient. No nurse can change or affect what they're dispensing. For those reasons, as further explained in our brief, we request the court affirm on all grounds in the appeal and reverse on the patent JMOL motion in the cross appeal. Thank you, Your Honors.